# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| Records and information stored at premises controlled by controlled by VERIZON, headquartered at 180 Washington Valley Road, Bedminster, NJ 07921 pertaining to cellular telephone 414-998-3746 | ) Case No. 22M604 ) ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Property described as: Records and information stored at premises controlled by VERIZON, headquartered at 180 Washington Valley Road, Bedminster, NJ 07921 pertaining to cellular telephone assigned call number 414-998-3746 described in Attachment A, incorporated herein.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: which constitutes evidence of Title 21, United States Code, Sections 841 and 846, conspiracy to distribute and possession with intent to distribute controlled substances.

The application is based on these facts: See attached affidavit.

☒ Delayed notice of _____ days (give exact ending date if more than 30 days: July 10, 2022 is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Brian M. D'Arcy_ 01/10/22 at 1:05 P.M.
Applicant's signature

Brian D'Arcy, FBI Special Agent
Printed Name and Title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim P. 4.1 by TELEPHONE (specify reliable electronic means):

Date: 1/10/2022

Judge's signature

City and State: Green Bay, Wisconsin

JAMES R. SICKEL, U.S. Magistrate Judge
Printed Name and Title

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELL PHONE NUMBER **414-998-3746** THAT IS STORED AT PREMISES CONROLLED BY VERIZON. | Case No. ___22 MU04___<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Brian D'Arcy being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Verizon, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey, 07921. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed as such since July 2017. Upon graduation from the FBI Academy in Quantico, Virginia, I was assigned to the Milwaukee Division, Green Bay Resident Agency. Since arriving in Green Bay, I have been assigned to work on various criminal violations, to include fraud, child pornography, armed robberies, and crimes occurring on Native American Reservations. I

have experience in conducting criminal investigations involving suspects using electronic communications to orchestrate criminal activity. I have assisted in the execution of search warrants for the purpose of obtaining documents relating to various criminal activity. As a Special Agent of the FBI, I am authorized to investigate violations of the criminal laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3.     The facts in this affidavit come from the Brown County Drug Task Force (BCDTF) and other law enforcement agencies, along with witness statements, all of which I believe to be truthful, in addition to my personal observations, training, and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Donte Lamar Moss, a/k/a "Tae," hereinafter MOSS uses telephone number **414-998-3746** (Target Telephone) subscribed to by "DONTE MOSS" at █████ █████████████████ ARLINGTON, TEXAS 76010, to commit violations of Title 21, United States Code, Sections 841 and 846, including by use of electronic communication. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further described in Attachment B.

## **JURISDICTION**

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), &

2

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.     The Brown County Drug Task Force (BCDTF), along with the Wisconsin Department of Criminal Investigations (DCI), Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), and other law enforcement agencies are investigating MOSS and others known and unknown concerning possible violations of Title 21 U.S.C. § 846 and 841(a), (b)(1)(A) (conspiracy to distribute and possess with the intent to distribute cocaine). The investigation to date has included traditional law enforcement methods, including, but not limited to: interviews with confidential sources and sources of information; information from other law enforcement officers, arrests of targeted subjects, telephone subscriber data, telephone toll data, intelligence gathered from recorded jail calls, and physical and electronic surveillance.

7.     On December 27th and December 28, 2020, Narcotics Investigator (NI) Matthew Secor received information from Green Bay Police (GBPD) Detective Craig Pakkala regarding several individuals involved in drug trafficking in the Brown County area. Detective Pakkala indicated he had received information from a Confidential Source (CI-1804) regarding subjects trafficking narcotics in the Brown County area. Detective Pakkala stated a male named "Donte" and another named "Thomas" make trips to Texas and return with narcotics. He indicated that they mostly fly to Texas and then drive back. Detective Pakkala stated that "Donte" and "Thomas" conspire with a male named "Darnell," who is from Milwaukee. Detective Pakkala identified Quincy D. Shields and Chauncey Hughes as assisting this drug operation in the Green Bay area. CI-1804 believed the subjects were laundering money through a beauty salon on Military Avenue, Green Bay.  SHIELDS was later identified by CI-1804 as QUINCY D.

3

SHIELDS (████79) and "Donte" was later identified by CI-1804 as DONTE L. MOSS (████82) via unlabeled photos provided by Detective Pakkala. "Chauncey Hughes" is believed to be CHAUNCY M. HUGHES (████88). The hair salon on Military Ave. was later identified as Xotic Kiss Hair, located at 410 S. Military Ave. Green Bay, WI.

8.      On January 4th, and January 5, 2021, NI Secor again received information from Detective Pakkala, who had been in contact with CI-1804. CI-1804 stated that SHIELDS had flown to Texas and was presently returning to Wisconsin with controlled substances. SHIELDS is believed to sell controlled substances obtained from Texas and has ties to the Milwaukee area. CI-1804 later identified the narcotics as cocaine and "hard" or crack cocaine. Detective Pakkala stated that SHIELDS goes to the Day's Inn on the east side of Green Bay to meet customers. Detective Pakkala further identified a male named "Tae" or "Donte" as assisting with sales who operates a vehicle with Texas license plates.  NI Secor located a WI CCAP entry for a September 2020 Brown County Sheriff's Department Speeding citation involving SHIELDS. In that entry, NI Secor observed SHIELDS was operating a vehicle with Texas Registration 81497S7. Texas DOT data identified that vehicle as a 2014 Volvo XC6 SUV, registered to DONTE MOSS of ████████ The Colony, TX.

9.      On January 19, 2021, investigators received information regarding several individuals exchanging currency at the Oneida Casino on the evening of January 17, 2021. Investigators later determined these subjects included DONTE L. MOSS (████82), an unidentified black male, and a white female. Later investigation revealed that QUINCY D. SHIELDS was also present but did not personally exchange currency. Follow-up information was received that TYESHA N. JACKSON (████85) also exchanged currency at an Oneida Casino location in the early morning hours of January 18, 2021.

4

10.     NI Secor and FBI Task Force Officer (TFO) Ryan Meader met with Oneida

Casino Security Agent James Martin on January 19, 2021 and learned that the three individuals,

later revealed to be MOSS, an unidentified black male, and a white female, exchanged $12,900

in U.S. currency at multiple casino locations. These locations included 2522 W. Mason St.,

Green Bay, WI and 2020 Airport Dr., Green Bay, WI. NI Secor and TFO Meader learned that the

subjects were at each location for a roughly fifteen-minute period, indicating they left one

location before driving to the other. Investigators later learned that SHIELDS also accompanied

this group at the casino locations. However, he did not exchange currency and only entered the

main casino location at 2020 Airport Drive. SHIELDS and MOSS were identified via Oneida

Casino surveillance footage by CI-1804.

11.     Investigators learned the three subjects arrived in a black SUV, later identified by

outside Casino staff at the W. Mason St. location as having license plate NYW7105. Martin also

later provided investigators a still image clearly identifying the vehicle registration, obtained via

the W. Mason St. location. Based on this investigation, NYW7105/TX was previously identified

by investigators as a 2014 Volvo SUV, registered to DONTE L. MOSS. Investigators were

familiar with this vehicle, as they observed it parked on January 7, 2021, in front of SHIELDS'

residence, located at 630 S. Madison St. Green Bay.

12.     Based on their training and experience, Case Agents are aware that individuals

involved in drug trafficking exchange currency for smaller denomination currency to avoid

possession of recorded currency, which is often utilized by law enforcement investigations.

Given the fact that the aforementioned individuals exchanged currency at two separate casino

locations during a short period of time, without gambling, I believe this behavior is consistent

with money laundering.

13.     On January 28, 2021, DCI Special Agent Ryan Messerschmidt and NI Secor met with CI-1804, who provided additional information on several individuals reportedly involved in trafficking cocaine in and around the Green Bay area. CI-1804 had previously shared information with GBPD Detective Craig Pakkala regarding several individuals, including QUINCY D. SHIELDS (███79), DONTE L. MOSS (███82), CHAUNCEY M. HUGHES (███88), and TYESHA N. JACKSON (███85). CI-1804 provided a phone number of (920) 412-4965, which they identified as a flip phone that SHIELDS and MOSS use to sell drugs. CI-1804 reported that SHIELDS and MOSS wash money at several Oneida Casino locations. CI-1804 stated they do this before making trips to Texas, in order to cash in smaller denomination bills. CI-1804 identified MOSS as "TAE," via a color photo investigators knew to be MOSS. CI-1804 provided phone number (414) 998-6391, which they used to contact MOSS. CI-1804 identified MOSS' vehicle as a black Volvo. CI-1804 identified MOSS and SHIELDS as staying at the Hawthorn Suites (335 W. St. Joseph St. Green Bay) and said that they had been staying there since November. TFO Meader observed MOSS' vehicle, a 2014 Volvo XC6 (NYW7105/TX), parked near building #7 at the Hawthorn Suites on January 27, 2021, following information from CI-1804. CI-1804 indicated that SHIELDS was also known to drive MOSS' Volvo.

14.     CI 1804 has previous criminal convictions for offenses, to include Forgery-Uttering, Bail jumping, and Resisting or Obstructing an Officer, and has been charged with Probation Violation. CI 1804 also has a pending referral in Brown County for Possession of Cocaine, which has not yet been charged. For several reasons, case agents believe CI 1804 is reliable and credible. CI 1804 has been providing information to law enforcement reference this investigation since December 2020. The information provided by CI 1804 has proven to be

6

constantly reliable and much of this intelligence has been corroborated by law enforcement through independent investigation. CI 1804 has been paid for this information, however, they have previously provided valuable information to law enforcement without compensation.

15.    On April 4, 2021, QUINCY SHIELDS was taken into custody by GBPD officers after they determined he possessed 33.04 grams of cocaine, 7.69 grams of THC, and $2,180 in U.S. currency.

16.    On April 9, 2021, TFO Meader and GBPD Officer Jeff Brann met with a confidential source who wishes to remain anonymous. The CS stated that, even though SHIELDS was running the operation and was the head of the group, a male they know as "TAE" (DONTE LAMAR MOSS, DOB: ███ 1982) was now taking over after SHIELDS' recent arrest for possession of cocaine. The CS stated nothing had changed, aside from the fact that MOSS would be making more money. The CS also stated that MOSS drove a green-colored Lexus. Investigators have previously observed MOSS in a vehicle matching this description.

17.    In response to an Administrative Subpoena, Verizon returned records showing that telephone number **414-998-3746** was subscribed to by "DONTE MOSS" at ███████ ████████ ARLINGTON, TEXAS 76010.

18.    In response to a previous Administrative Subpoena, Verizon returned records from April 18, 2021 to May 18, 2021, which showed that telephone number **414-998-3746** was subscribed to by "MIKE JONES" at ███████████, MILWAUKEE, WI 53212. Case agents believe that MOSS has used the alias of "MIKE JONES" in an effort to conceal his identity.

19.    TFO Meader used a law enforcement service application known as NPAC (National Portability Administration Center) to verify and search the service provider of **414-**

7

**998-3746**. The number's service provider was listed as Verizon, and the application found that the cellular telephone had not been ported to another company. TFO Meader has utilized NPAC in the past and has found the information to be accurate and reliable.

20.    Additionally, **414-998-3746** was listed as belonging to MOSS in the Brown County Sheriff's Office reporting & record system (GERP) from a police contact on September 28, 2020.

21.    Following Quincy SHIELD's arrest, investigators have continually monitored jail and prison phone calls made or received by SHIELDS since April 2021. A review of these phone calls has revealed that SHIELDS frequently speaks with MOSS and DANIELS. During these phone calls, SHIELDS, MOSS, and DANIELS appear to communicate in heavily coded conversations about drug trafficking activities amongst DTO members. A number of these phone calls have been placed to telephone number **414-998-3746**. Examples of some of these phone calls are provided below.

A. On July 1, 2021 at approximately 1:25pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, MOSS told SHIELDS he was "Taking off on the plane right now and landing at 3:40." SHIELDS told him he would call him later. Based on Case Agents' knowledge of this investigation, it is believed that MOSS was referring to traveling to Texas to purchase narcotics.

B. On July 24, 2021 at approximately 10:36pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, SHIELDS and MOSS used coded conversation regarding money and drug distribution. MOSS told SHIELDS he had "a couple dollars laying around." Based on their training and experience, investigators believe that SHIELDS was referring to the fact that other members in the organization owed money to SHIELDS, but

8

had not paid their debts. SHIELDS asked MOSS if "Cuz" (known through this investigation to be RANSOM) and them "give that to you?" MOSS replied, "..no I didn't, I just took it out of mine.." and "..I didn't have time to run over there I just took it out of mine. I know you wanted to get in motion..." Case Agents believe this meant that MOSS took money from his own profits and used it to replenish SHIELDS' share, with the intention of replenishing it once other members of the organization paid their debts. SHIELDS then told MOSS to "..store that shit away..," meaning he wanted MOSS to put the money in a safe place and save it for SHIELDS.

C. On July 28, 2021 at approximately 2:44pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, SHIELDS was upset with MOSS because he wanted to know why his "things" were "sitting around." MOSS explained he believed SHIELDS wanted him to hold everything because of their prior phone call from July 24, 2021 at approximately 10:36pm. SHIELDS stated, "That shit is frustrating. Ah na I meant don't do nothing with the 'Cheese' bro, with whatever you had laying around. I didn't mean..." Based on Case Agents' training, experience, and knowledge of the case, they believe SHIELDS wanted MOSS to save SHIELDS' U.S. Currency ("Cheese"). SHIELDS also clarified that he did not want MOSS to hold on to SHIELDS' share of product (controlled substances). SHIELDS also referred to MOSS as "Tay," which has been identified as a nickname for MOSS, further confirming MOSS as using this phone number.

D. On July 29, 2021 at approximately 5:49pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, MOSS and SHIELDS continued to discuss the miscommunication from their prior phone call on July 24, 2021 at approximately 10:36pm. SHIELDS stated, "I don't know what would make you think that I would tell

9

you to hold something like that, I don't know what you was thinking." Later in the conversation, MOSS told SHIELDS that "KOOGIE" (KEON RANSOM) and MOSS had, "…just busted down the middle, I gets half and he gets half. That way we figure, shit, if he gets busy or I slow up you know what I'm saying, it will still be moving you know what I'm saying." Based on Case Agents' training, experience and knowledge of this case, they believe that MOSS was explaining how product (controlled substances, such as cocaine) was divided amongst him and RANSOM. SHIELDS then said, "…I'm over there too then?" and MOSS replied, ""Yeah, that's what I said." Case Agents believe SHIELDS was confirming that a portion of his share of product was also being distributed by RANSOM, which MOSS confirmed.

E.  On September 9, 2021, at approximately 12:00pm, Q. SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, MOSS and Q. SHIELDS discussed the arrest of TRAVIS DARNELL SHIELDS (████1989). T. SHIELDS was arrested by the Racine County Sheriff's Office during a traffic stop which resulted in the seizure of 74.3 grams of marijuana, one Glock pistol, one magazine containing 13 rounds of ammunition, and one extended magazine containing 25 rounds of ammunition. MOSS told Q. SHIELDS, "He said all he had on him was the gun… He said all he had was the gun and two packs of weed." Q. SHIELDS stated, "I just told this nigga to sit down dog, I just told this nigga…" MOSS replied, "Listen Q, I'm talking to the nigga the other day. The nigga got two guns with, with two extended clips, he got about five packs of weed. He got about fif, twelve thousand on him, his pants sagging. I say Trav you smoking weed, you drinking (UI), how you doing all this shit at once bro?" MOSS and Q. SHIELDS discussed the possibility that T. SHIELDS may be released because the female driver, APRIL C.

MOOR, (████1989) had a CCW permit. MOSS replied, "I hope that's the case, cause I need him right now." Case Agents believe that MOSS was referring to his need for T. SHIELDS to assist him with drug distribution.

F. On September 9, 2021, at approximately 12:19pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, Q. SHIELDS and MOSS continued their previous conversation about T. SHIELDS' arrest. MOSS stated, "I told the boy man, I told him stop riding with that motherfucking gun. Leave that stupid shit at... Especially when I, I, I... I understand down here... I understand you need it, I get it, I get it... I understand but G you don't need that motherfucker every... You don't got to go to Chicago with it." Based on Case Agents' knowledge of this case, they believe MOSS explained that he had warned T. SHIELDS about carrying "that motherfucking gun." MOSS also acknowledged T. SHIELDS' need to carry the gun. Based on Case Agents training and experience, they are aware that people involved in the trafficking and distribution of illegal controlled substances often maintain weapons. These weapons are often concealed on their person, accessible inside their vehicle, or kept in close proximity to the controlled substance being trafficked, in order to protect their quantity of drugs and/or money. During the same phone call, Q. SHIELDS asked MOSS, "What it name, bro, bro gave you that to, to, to take care of that right?" MOSS replied, "Say that again." Q. SHIELDS repeated, "I said bro gave you that to take care of that right?" MOSS replied, "He didn't give me no money. I was assuming he was bringing it to me right now. But he has given me no money. I got what I supposed to... I got what I supposed to have for you. He did not give me any money." Q. SHIELDS stated, "He told me (UI) gave you what it name already." MOSS replied, "But listen to what I'm saying though. I damn near got about five thousand of his money

11

so I'm assuming that he was probably going to tell me to keep that for you. I'm not, I'm not sure but I do got it." Q. SHIELDS stated, "Yeah that's probably what it was (UI) fuck dog." MOSS replied, "But I got, it's about thirty, thirty-two, I got about thirty-two hundred of it in cash and then the rest is you, you dig what I'm saying?" Q. SHIELDS stated, "Yeah, yeah man, yeah, yeah, yeah." MOSS stated that he (T. SHIELDS) never told him about giving him any money, but is assuming he was going to do it when he got there today. Based on the content of this conversation and Case Agents' knowledge of this case, it is believed that T. SHIELDS was supposed to give MOSS money from Q. SHIELDS' proceeds from drug sales in order to purchase additional product.

G. On September 11, 2021 at approximately 10:08pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, MOSS told SHIELDS that he was expecting to be on the plane, but he was waiting to see what time the shipping company was going to pick the truck up. MOSS told SHIELDS that he was not driving down there and spending two days on the highway, but he was driving back. MOSS stated, "I got Foo Foo lined up for next week. Shit we all going to the place. So shit he lined up already. So I'm getting everything, that's why I'm getting everything together for him." SHIELDS replied, "That's what I'm saying he already… That's what I'm saying bro he already told me I was already what it name already lined up. That's what I'm trying to say." MOSS replied, "Okay, okay, yeah, yeah, it's, it's here (UI)…." SHIELDS stated, "He already told me. That, that's what I tell you yesterday. But you made it seem like there's some other shit." MOSS replied, "No, what I was saying was… He, he, he sent, he sent some but it wh… What I was saying what, what, what she had. You know what I'm saying I didn't want to leave that over there while he. You know what I'm saying?" SHIELDS replied, "I think

12

that, that's… What, what, what that, what he want you to get that's on, that, that's probably on that's what I'm thinking." SHIELDS continued, stating, "I'm the only motherfucker taking L's here." Based on Case Agents' knowledge of this investigation, it is believed that this drug trafficking organization obtains a supply of drugs from an unknown source in Texas.  It is believed that members of this organization will travel by plane to Texas and drive back with their new supply.  It is believed that during this phone call, MOSS and SHIELDS were referring to a supplier involving an unidentified male with the nickname "Foo Foo."  It is believed that when SHIELDS stated, "I'm the only motherfucker taking L's here," SHIELDS felt as though he was the only one in the organization not making a profit.

H. On September 13, 2021 at approximately 12:00pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, MOSS spoke with Q. SHIELDS about T. SHIELDS' case. MOSS told Q. SHIELDS, "Basically what TRAVIS is saying is his DNA is all over the fucking gun." Q. SHIELDS asked, "How is that possible" and MOSS replied, "Cause he touched the motherfucker. What you mean how is it possible." MOSS told Q. SHIELDS that TRAVIS was panicking. MOSS later told Q. SHIELDS that T. SHIELDS thought his prints were on the gun. MOSS then appeared to fabricate a story that the driver, APRIL C. MOORE (████1989), went out with some friends the night before and had the gun for protection. She then forgot the gun was in the car and T. SHIELDS did not know that it was in the car.

I. On October 2, 2021 at approximately 2:08pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, SHIELDS talked to MOSS and DANIELS. SHIELDS asked DANIELS, "How everything work out with them, them shoes?" DANIELS replied,

13

"One pair came the other pair didn't" and stated, "But that's still cool man shit. Matter of fact I had, I think I had, I think I had ah, yeah I had two pair in that box." DANIELS said he will figure it out and SHIELDS asked what he meant. DANIELS replied, "I just gotta go down there." Both DANIELS and SHIELDS appeared intentionally vague during this conversation. Based on Case Agents' training, experience, and knowledge of this investigation, it is believed that DANIELS and SHIELDS were speaking in code to refer to their distribution of controlled substances. MOSS told QUINCY, "We moving too, we moving too, so you know we moving too." QUINCY asked "Where?" and MOSS replied, "Man you slow as a bitch (UI)." QUINCY replied, "Oh yeah, yeah I'm already knowing, I already know. Yeah, yeah I figured that out." It is believed this is a reference to MOSS and DANIELS making "moves" or obtaining and selling more product (controlled substances).

J. On October 20, 2021 at approximately 5:47pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, SHIELDS questioned MOSS as to why he missed SHIELDS' call earlier. MOSS said, "Shit awe man we was... I was doing all kinds of shit. I think I was in the DMV when you called. Cause I told you they gave me a ticket for driving without a license." Investigators are aware that MOSS met with ELMORE ANDERSON at the Department of Motor Vehicles located at 942 Van Der Perren Way in the Village of Ashwaubenon on October 20, 2021 at 2:33pm, during the controlled purchase of .75g of cocaine base. During that delivery, MOSS was the suspected source of cocaine base to ANDERSON, who then delivered it to CI 2034.

K. On October 27, 2021 at approximately 11:36am, SHIELDS made a phone call to MOSS at **414-998-3746**. During this phone call, MOSS took a call on another line and could be

14

heard asking the caller, "What's going on?" MOSS told the caller, "Okay ah Save-a-Lot." This call was received at approximately 11:48am and the duration was approximately 28 seconds. Based on Case Agents' training, experience, and knowledge of this case, it is believed that the phone call was in relation to a drug transaction.

L.   On November 4, 2021, at approximately 10:03am, SHIELDS made a phone call to MOSS at **414-998-3746**. During this call, Q. SHIELDS talked about having about ten months of incarceration left. Q. SHIELDS stated, "I'm trying to get home bro. My life is in shambles right now. You niggas, you nigga is fucking my, my shi… Fucking everything I done built up. You and my brother." This corroborates the belief that Q. SHIELDS was the head of the DTO before being incarcerated. During the same phone call. Q. SHIELDS spoke with his brother, T. SHIELDS, on a conference call. T. SHIELDS stated that he did exactly what Q. SHIELDS told him to do. T. SHIELDS stated, "I go grab what it name and leave a couple dollar left." Q. SHIELDS replied, "I understand that. Bro I'm saying you got, you got what my, you got my baby tied up bro. Like that, I could be in rotation. You got my shit tied up." T. SHIELDS replied, "You already is in rotation. Your shit (UI) your shit aint in rotation cause your shit been in rotation. I don't understand how you not in rotation." Investigators believe this is another reference to Q. SHIELDS complaining that T. SHIELDS has Q. SHIELDS' product. T. SHIELDS responded that Q. SHIELDS' product is out and being sold (in rotation). Q. SHIELDS responded, "No I I'm in, I'm in rotation, in rotation with my other what it name." Investigators believe that Q. SHIELDS was stating that his other supply of product was being sold. It is believed this was additional product being sold by other DTO members. T. SHIELDS commented about something being left at "Pops crib." Q. SHIELDS replied, "If that was me then he done

15

sent, he done sent you all the cheese is what I'm saying. If that's the case cause I had got none of it." Case Agents believe this comment was in reference to T. SHIELDS leaving a portion of Q. SHIELDS' product with "Pop," and that he did not receive any of the proceeds.

M. On December 2, 2021, at approximately 5:38pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During this call, MOSS told SHIELDS, "They just hit Pooka house." MOSS stated that he was not there, but his guy was there. MOSS stated that Pooka "was just up here," and that Eldon had a party bus and they were at the Bay Bar. MOSS talked about the house being raided, stating, "They say it was right after he took care of somebody and went back in the house. Shit they came right back in behind him." MOSS commented, "Motherfucker text you out that fast they aint even wait to get a controlled buys on you." It is believed this conversation referred to "Pooka" being arrested by police following a drug transaction at his residence. "Pooka's" identity is unknown. MOSS and SHIELDS also talked about DANIELS' upcoming court date. MOSS commented that he believed they were going to give DANIELS a plea. MOSS commented that he told DANIELS, "You should try to get that shit pushed back man so it get close to you coming home. You know what I'm saying. I'm like G you know I got you all that aint no issue G, but shit try to push that shit back shit… Let me get some motherfucking help out here first." Investigators believe this comment referred to DANIELS postponing his sentencing on his outstanding charges, so the sentencing was close to SHIELDS' release from prison. This would ensure that either DANIELS or SHIELDS was out of prison to assist MOSS with drug trafficking.

16

N. On December 3, 2021 at approximately 1:28pm, SHIELDS made a phone call to MOSS at **414-998-3746**. During the call, MOSS told SHIELDS that "Moe" called him in the morning, stating that they moved him to "the barracks." MOSS stated that "TRAVIS" and "KENAN" were there with him. "Moe" is known to be CHAUNCEY HUGHES. Investigators believe this conversation refers to the DOC housing assignment for HUGHES, TRAVIS SHIELDS, and "KENAN." MOSS also stated that he and DANIELS were going to "fall out" because "he done gave RaRa my shit." MOSS said that he felt like "RaRa" was "stalling him out." MOSS added that DANIELS told him that he would take care of it and complained that he should not have to keep asking for his "shit." MOSS said, "A motherfucker call you and say hey pull up shit you supposed to be Johnny on the spot pulling up." MOSS stated that this isn't the first time he has called and asked for his "shit." He stated that he let it go last time because he was going out of town. MOSS said that he was getting tired of waiting. Investigators believe that this conversation referred to DANIELS providing controlled substances to "RaRa," which was supposed to be for MOSS. Based on MOSS' comments, it appears that MOSS previously had to call DANIELS to obtain controlled substances. This corroborates the belief that MOSS is being provided controlled substances through DANIELS.

22.    Investigators' review of SHIELDS' jail phone calls to **414-998-3746** has confirmed that MOSS has been using **414-998-3746** to further operations of the Drug Trafficking Organization (DTO).

23.    A review of MOSS's criminal history revealed charges of Possess with intent to deliver cocaine, Possess with intent to deliver THC, and 1st degree reckless injury. MOSS is

17

currently on active supervised released with the Wisconsin Department of Corrections for the charges of 1st Degree Reckless Injury and Vehicle Operator Flee/Elude Officer.

24.     On June 24, 2021, the BCDTF conducted a controlled purchase of crack cocaine from MOSS using CI-1975. CI-1975 contacted MOSS at telephone number 920-396-4093 to arrange for the purchase of $200 of crack cocaine. The CI then met with MOSS in the parking lot of the Ross Dress for Less at 801 S. Military Avenue in Green Bay. CI-1975 exchanged $200 in U.S. Currency with MOSS for two clear, plastic baggies that contained what CI-1975 believed to be $200-worth of crack cocaine. The crack cocaine was later tested by investigators, weighing 1.31 grams and testing positive for the presence of cocaine base. The controlled purchase of narcotics was physically and electronically surveilled and recorded by investigators.

25.     On September 9, 2021, SHIELDS made a phone call to MOSS at **414-998-3746**. During the phone call, MOSS took a call on the other line and stated, "Steve you better hurry up I'm done in the next thirty minutes until tomorrow, so you better get there now. Oh well it's over with (UI)." SHIELDS then told MOSS, "You gotta start remembering this phone I'm on, this motherfucker monitored and recorded." Investigators believe that the "Steve" MOSS referred to in the phone call was STEVEN CHERVENKA ( ███ 1967) and that the phone call was possibly arranging for the purchase of a controlled substance, likely cocaine base.

26.     On January 5, 2022, investigators spoke with CI-1975 regarding their relationship with MOSS. CI-1975 stated that approximately nine months ago he had met an individual by the name of STEVEN CHERVENKA who was also a user of crack cocaine. CHERVENKA introduced CI-1975 to MOSS. Initially, CHERVENKA "middled" crack cocaine for CI-1975 by purchasing crack cocaine from MOSS for CI-1975. Eventually, CHERVENKA introduced CI-

18

1975 to MOSS to purchase crack cocaine directly from him. CI-1975 described CHERVENKA as a crack cocaine addict who uses multiple times per day.

27.     Investigators have reviewed cell phone toll and PEN data records for cellular telephone number **414-998-3746**. Investigators identified contacts between the cell phone and other members of the DTO, along with other unknown to law enforcement individuals.

> a. Tolls records from **414-998-3746** indicate 515 contacts with DARNELL DANIELS (414-458-8113) between April 25 and December 14, 2021. Additionally, a total of 169 text messages were sent or received from DANIELS between November 6, 2021 and January 5, 2022. DANIELS is a high-ranking member of the DTO and is believed to be a narcotics distributor/supplier.

> b. Tolls records for **414-998-3746** show 1,963 contacts with ELMORE ANDERSON (920-203-4730) between August 20 and December 16, 2021. Additionally, a total of 282 text messages were sent or received from ANDERSON between November 8, 2021 and December 25, 2021. Elmore Anderson is a known "middler" and user within the DTO.

28.     Additional review of cell phone toll and PEN data records for cellular telephone number **414-998-3746** has revealed that telephone number 920-932-2463, which is believed to be used by STEVEN CHERVENKA, has had significant communication with the target telephone number via phone calls and text messages. Between July 23, 2021 and January 2, 2022 CHERVENKA made or received 89 phone calls to/from telephone number **414-998-3746** and sent or received 30 text messages. CHERVENKA also sent text messages to telephone number **414-998-3746** as recently as January 4, 2022.

19

29.     Based on their training and experience, investigators are aware that members of drug trafficking organizations often utilize text messaging services to communicate about drug-related activity. Given the number of text messages sent to/from telephone number **414-998-3746** to various members of the DTO and users such as CHERVENKA, Case Agents believe that it is likely that many of these messages are drug-related. Additionally, Case Agents are aware that STEVEN CHERVENKA is a habitual user of crack cocaine. This, coupled with the information regarding CHERVENKA provided by CI-1975, indicate that the text messages and phone calls made by CHERVENKA to telephone number **414-998-3746** are likely drug-related.

30.     Given this information, investigators are seeking text message content for telephone number **414-998-3746**. The content of these text messages may assist investigators with the following:

    **a.**  Identifying associates and co-conspirators of MOSS and the DTO, as well as sources of supply for MOSS and members of the DTO.

    **b.**  Understanding the inner workings and general operation of the DTO, to include the locations of stash houses, money, or supplies of narcotics.

    **c.**  Determining the extent to which text messaging is used to facilitate the operation of the DTO.

31.     In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Verizon subscribers may be located on the computers of Verizon. Further, I am aware that computers located at Verizon contain information and other stored electronic communications belonging to unrelated third parties.

20

32. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon for weeks or months.

33. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

34. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long- distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

21

35. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

36. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

37. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular

22

device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

38. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

39. As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the

23

foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

40.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

24

## CONCLUSION

41.    Based on the forgoing, I request that the Court issue the proposed search warrant.

42.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Verizon. Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

43.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Brian M. D'Arcy  01/10/22 at 1:05 P.M.

Brian M. D'Arcy, Special Agent
Federal Bureau of Investigation

Sworn and attested to me by reliable electronic means pursuant to the requirement of Fed R. Cr. P 4.1 (telephone) this 10 day of January, 2022.

Honorable James R. Sickel
United States Magistrate Judge

25

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with cell phone number **414-998-3746** that is stored at premises owned, maintained, controlled, or operated by Verizon, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey, 07921

**ATTACHMENT B**

**Particular Things to be Seized**

**I. Information to be disclosed by Verizon**

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to Verizon or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages from **December 16, 2021 to the present** stored and presently contained in, or on behalf of the account or identifier;

b.      All existing printouts from original storage of all of the text messages described above;

c.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long-distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from **December 16, 2021 to the present;**

d.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message **December 16, 2021 to the present;**

e.    All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f.    Detailed billing records, showing all billable calls including outgoing digits, from **December 16, 2021 to the present;**

g.    All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from **December 16, 2021 to the present;**

h.    Incoming and outgoing telephone numbers, from **December 16, 2021 to the present;**

i.    All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

j.    All records pertaining to communications between Verizon and any person regarding the account or identifier, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within **7 days** of issuance of this warrant.

2

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, involving Donte Lamar Moss **since December 16, 2021**, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.     The sale or purchase of illegal drugs;

b.     Communications between Moss, other members of the DTO, co-conspirators, associates, and sources of supply;

c.     Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

d.     Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

e.     Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

f.     The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

g.     This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation,

3

who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Verizon and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon. The attached records consist of

_____

**(pages/CDs/megabytes)]**. I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon and they were made by Verizon as a regular practice; and

    b.    such records were generated by Verizon's electronic process or system that produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon in a manner to ensure that they are true duplicates of the original records; and

5

2.     the process or system is regularly verified by Verizon], and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                Signature

6